IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>TRAVIS J. PENMAN-KEEVER,<br><br>    Defendant. | Case No. 3:24-CR-30023-NJR-1 |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

On January 31, 2024, Defendant Travis J. Penman-Keever was pulled over for a traffic stop along Interstate 70 in Madison County, Illinois. Penman-Keever and his passenger, a 16-year-old female, were in a rented truck, allegedly traveling from Colorado to Pennsylvania to attend a graduation party. After a search of his vehicle, Penman-Keever was arrested for weapons and narcotics violations. Police then obtained a search warrant for iPhones and an iPad found in the vehicle. After a search of those electronics, Penman-Keever was charged by Complaint in this federal district court with sexual exploitation of children in violation of 18 U.S.C. § 2251(a). (Doc. 1). A grand jury later charged Penman-Keever by Superseding Indictment with one count of sexual exploitation of a child in violation of 18 U.S.C. § 2251(a) (Count 1) and one count of transportation of child pornography in violation of 18 U.S.C. §§ 2252A(a)(1), (b)(1) (Count 2). (Doc. 37).

Penman-Keever now moves to suppress evidence and statements gathered as a result of the traffic stop and search of his vehicle, arguing the evidence was obtained in

violation of the Fourth Amendment to the United States Constitution. (Doc. 58). The Government filed an opposition to the Motion (Doc. 65), and the Court held an evidentiary hearing on April 10, 2025. (Doc. 78). For the reasons set forth below, Penman-Keever's Motion to Suppress is denied.

## BACKGROUND

The following relevant facts are established by the testimony elicited at the evidentiary hearing and the exhibits admitted into evidence, including dashcam and bodycam footage of the traffic stop. (Doc. 81).

**A. Testimony of Trooper Griffin Jackman**

On January 30, 2024, Trooper Griffin Jackman, a patrolman with the Illinois State Police (ISP) on its Highway Interdiction Team, was on duty and driving on Interstate 70 in Madison County, Illinois. (Doc. 81 at p. 8). Around 12:20 p.m., Trooper Jackman observed a Dodge Ram pickup truck with a Utah license plate veer to the right and cross onto the white line several times, which he testified could indicate a fatigued, impaired, or distracted driver. (*Id.* at pp. 9, 13). He also saw the vehicle "following dangerously close" to a tractor-trailer. (*Id.* at p. 9). Trooper Jackman testified that he used a mile-marker sign as a delineator post as well as the radar in his vehicle as a stopwatch to determine that the driver, Penman-Keever, was about 1.6 seconds behind the tractor-trailer. (*Id.* at p. 11). Trooper Jackman explained that a safe distance when traveling 70 miles per hour is at least three seconds behind the next vehicle. (*Id.* at pp. 11-12). Trooper Jackman also visually identified that Penman-Keever was about 160 feet behind the tractor-trailer, which was too close. (*Id.* at p. 12). In addition to veering onto the white

line and following too closely, Trooper Jackman noticed that Penman-Keever was rigidly holding the steering wheel and seemed to be trying to wake up his passenger as Trooper Jackman drove alongside him. (*Id.* at p. 63). Trooper Jackman initiated a traffic stop, and Penman-Keever pulled over. (*Id.* at p. 13).

Trooper Jackman testified that the truck—which he knew from a license plate inquiry to be a rental vehicle—had aftermarket bed rails, which is an expensive feature. (*Id.* at p. 15). He also saw the truck was covered in road grime, which indicated to him that it had traveled through multiple states. (*Id.*). As Trooper Jackman approached the vehicle, he noticed the driver frantically looking around and checking his mirrors, as well as a large dog in the back seat. (*Id.* at p. 14). Upon arriving at the passenger side, Trooper Jackman observed that the interior was very messy with multiple chargers in the middle console, multiple food wrappers and drinks in the center console, and clothing or blankets in the front of the truck. (*Id.* at pp. 15-16). He also smelled "raw cannabis" that was "very pungent and very fresh."[1] (*Id.* at p. 16).

With regard to the truck's occupants, Trooper Jackman testified that the female passenger had been sleeping and appeared startled at his presence. (*Id.* at p. 17). She was holding a cell phone and a sculpture of some sort so tightly that her knuckles were white. (*Id.* at p. 21). He also noticed a significant age difference in the two occupants and that the passenger was wearing a light garment on top, if any, and had a blanket covering her. (*Id.* at p. 17). Meanwhile, Penman-Keever made "multiple darting glances down the

---

[1] Trooper Jackman later testified that he also smelled the odor of burnt marijuana on Penman-Keever, although he admitted he did not believe Penman-Keever had smoked marijuana. (*Id.* at pp. 81, 90).

roadway, and he continued to anchor himself, moving positions in the driver's seat." (*Id.*). Trooper Jackman testified that these furtive movements made him nervous, as he did not know if Penman-Keever was trying to conceal a weapon or contraband. (*Id.* at p. 17, 67).

Trooper Jackman told Penman-Keever the "primary" reason for the stop, which was following too closely, but did not mention improper lane usage. (*Id.* at p. 19). The trooper testified that he only mentioned one reason for the stop because he was concerned about Penman-Keever's furtive movements, and he did not know if the dog was aggressive. (*Id.*). Penman-Keever produced his driver's license, but when Trooper Jackman asked for proof of insurance, Penman-Keever reached for the glove box before stopping himself, then reached for the center console and removed a blanket that was covering it before again stopping himself. (*Id.* at p. 20). Trooper Jackman testified these movements are common when a person is trying not to disclose contraband or a weapon. (*Id.*). Additionally, Trooper Jackman observed that Penman-Keever was very nervous; his hands were shaking uncontrollably and he continued to glance down the roadway. (*Id.* at p. 20, 68). Based on Penman-Keever's movements, as well as the smell of cannabis, Trooper Jackman believed there was contraband and/or a weapon in the vehicle. (*Id.* at pp. 21).

At that point, Trooper Jackman asked Penman-Keever to come back to his squad car while he checked Penman-Keever's license and registration and made sure there were no warrants for his arrest. (*Id.* at p. 22). As he got out of the truck, Penman-Keever denied having a weapon. (*Id.* at p. 23). When back at his vehicle, Trooper Jackman used the code "Secure 30" on his radio to notify other officers to get in contact or head his way for

backup. (*Id.* at p. 25). According to Trooper Jackman, he called for backup because the smell of cannabis gave him probable cause to search the vehicle. (*Id.* at pp. 25-26).

As Trooper Jackman ran Penman-Keever's information, Penman-Keever began volunteering irrelevant information, which Trooper Jackman considered "very nervous and erratic behavior." (*Id.* at p. 26). For example, Penman-Keever offered to get a water from his truck for Trooper Jackman, stating that "she" makes him stop at every Love's truck stop. (Doc. 65-3). Trooper Jackman testified that he believed this could have been an attempt to flee or retrieve a weapon. (Doc. 81 at p. 26). Penman-Keever also asked Trooper Jackman if his vehicle was supercharged, told him that some people do appreciate the work Trooper Jackman does, and asked whether he wanted to meet the dog. (Doc. 65-3). Penman-Keever said he could get the dog and try to get her to go to the bathroom. (*Id.*). Trooper Jackman, fearing Penman-Keever may try to flee, sent out an electronic message to other officers from his computer to advise them of the situation. (Doc. 81 at p. 27).

While in the squad car, Trooper Jackman told Penman-Keever he would receive a written warning. (*Id.* at p. 25). He also asked Penman-Keever general travel questions about where they were headed. (*Id.* at p 28). Penman-Keever said a graduation party for his friend's kid in Pittsburgh, which Trooper Jackman found odd since it was the end of January. (*Id.*). Penman-Keever claimed they were going to Pittsburgh for one day and then immediately returning to Colorado. (Doc. 65-3).

While Trooper Jackman worked on the written warning, another officer, Sergeant Patterson, arrived on the scene and approached the passenger side of Penman-Keever's

truck. (*Id.* at p. 29). Penman-Keever asked, "We good here?" and Trooper Jackman explained that he had probable cause to search the vehicle based on the smell of marijuana. (*Id.*). Penman-Keever told Trooper Jackman he doesn't smoke, but that "she has." (Doc. 65-3). Sergeant Patterson began talking to the minor passenger, at which point Trooper Jackman asked Penman-Keever questions about his address and more travel questions. (*Id.*).

Trooper Jackman testified at the evidentiary hearing that he waited to tell Penman-Keever about the search of the vehicle because he did not know how Penman-Keever would react or if he would try to flee. (*Id.*). After being informed of the search, Penman-Keever asked if Illinois has "reciprocity" with Colorado, which considers a vehicle to be an extension of one's domicile. (*Id.*). When Trooper Jackman said no, Penman-Keever admitted he had a pistol in the car but clarified he was not a felon and had never been arrested. (*Id.*). He also questioned whether the officers needed parental consent to search the minor passenger. (*Id.*). This prompted Trooper Jackman to ask how old the passenger was. (*Id.*). Penman-Keever said he was 40 and the female passenger, allegedly his girlfriend's daughter, was 16. (*Id.*). At that point, Trooper Jackman testified, he also had concern for the safety of the minor. (Doc. 81 at p. 31).

**B.  Testimony of Sergeant Zachary Heard**

The Court also heard testimony from Zachary Heard, a 20-year employee of the ISP and a sergeant on the Highway Interdiction Team. As a sergeant, Heard performs the same duties as a trooper but also supervises his colleagues while in the field. (*Id.* at p. 93). Sergeant Heard testified that under Illinois law, a driver must stay a reasonable and

prudent distance behind another vehicle, which is about three seconds behind according to standards set by the National Highway Traffic Safety Administration (NHTSA). (*Id.* at p. 95). He also testified that the ISP follows NHTSA standards. (*Id.* at p. 96).

On January 31, 2024, Sergeant Heard had been parked next to Trooper Jackman in the center median of Interstate 70 when Trooper Jackman entered eastbound traffic to initiate a stop. (*Id.*). Sergeant Heard later received Trooper Jackman's "Secure 30" message and saw a message on his computer that Trooper Jackman was dealing with a male occupant that he thought may try to flee. (*Id.* at pp. 97-98). As a result, Sergeant Heard responded to Trooper Jackman's location. (*Id.* at p. 98).

Upon arriving at the scene, Sergeant Heard approached Trooper Jackman's vehicle and immediately noticed that Penman-Keever was sitting in the patrol car with one foot out and his hand posted on the "A" pillar. (*Id.* at p. 99). Sergeant Heard testified that, in his experience, Penman-Keever's stance indicated extreme nervousness, a fear of being trapped, and no concern for the immediate violation—but instead a major concern for a secondary issue. (*Id.*). Sergeant Heard resorted to touching Penman-Keever to get his full attention; auditory commands were not working because Penman-Keever's attention was elsewhere. (*Id.*). Sergeant Heard also observed that Penman-Keever used legal jargon when talking with the police, which indicated premeditation. (*Id.*). Sergeant Heard explained that people involved in interstate crimes typically premeditate as to what they would say to the police, while others who encounter the police usually do not use legal jargon. (*Id.*). Sergeant Heard admitted that, despite his concern that Penman-Keever may flee, Sergeant Heard never put handcuffs on him. (*Id.* at p. 104).

### C. Search of the Vehicle

While searching the vehicle, Trooper Jackman found a loaded handgun in the center console, suspected cannabis in the minor's backpack, a plastic baggy of suspected cocaine in Penman-Keever's wallet, multiple empty plastic baggies the same size as the bag containing the suspected cocaine, a box of condoms, and at least two sexual pleasure devices including one that was being charged in the center console. (*Id.* at pp. 33-41).

Penman-Keever was arrested for a weapons violation and a narcotics violation. The next day, officers obtained search warrants for iPhones and an iPad seized at the scene. As mentioned above, Penman-Keever was later charged by Superseding Indictment with one count of sexual exploitation of a child in violation of 18 U.S.C. § 2251(a) and one count of transportation of child pornography in violation of 18 U.S.C. §§ 2252A(a)(1), (b)(1).

## DISCUSSION

The Fourth Amendment to the U.S. Constitution protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is reasonableness," which is "measured in objective terms by examining the totality of the circumstances." *United States v. Yang*, 39 F.4th 893, 899 (7th Cir. 2022), *cert. denied*, 143 S. Ct. 754 (2023) (quoting *United States v. Price*, 28 F.4th 739, 748 (7th Cir. 2022), and *United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc)).

### A. Reasonable Suspicion to Initiate the Traffic Stop

Because a traffic stop is a seizure, it must be "reasonable under the circumstances." *Yang*, 39 F.4th at 899; *Cole*, 21 F.4th at 427. To be reasonable, a traffic stop must be "justified

at its inception, and reasonably related in scope to the circumstances which justified the interference in the first place." *Cole*, 21 F.4th at 427 (quoting *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt Cnty.*, 542 U.S. 177, 185 (2004)). Because traffic stops are akin to *Terry* stops, only reasonable suspicion of wrongdoing is required. *Yang*, 39 F.4th at 899. "Although a mere hunch will not suffice, 'the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause.'" *Id.* (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)).

Penman-Keever argues that Trooper Jackman lacked reasonable suspicion to stop him when he was not following too closely behind another vehicle. Section 625 ILCS 5/11-710 governs the offense of following too closely and requires that a driver not follow another vehicle more closely than is "reasonable and prudent." 625 ILCS 5/11-710. Penman-Keever argues that, in contrast to Trooper Jackman's report, the video evidence from the dashcam reflects that a reasonable and prudent distance existed between his Dodge Ram and the semi-truck traveling in front of him. Because the dashcam video does not establish that a reasonable officer would have perceived a traffic violation for following too closely during the time period alleged by Trooper Jackman in his report, he lacked reasonable suspicion to initiate the traffic stop.

The Court disagrees. Sergeant Heard testified that the ISP follows NHTSA's standards, which recommend a safe distance of at least three seconds behind another vehicle, or, at 70 miles per hours, about the length of a football field. Penman-Keever was only 1.6 seconds or 160 feet behind the tractor-trailer. Thus, a reasonable officer trained

by the ISP would have believed a traffic violation had been committed.

Penman-Keever also disputes Trooper Jackman's additional justification for the stop—that Penman-Keever veered out of his lane, crossing the white line several times—because Trooper Jackman did not mention that violation at the time of the stop to either Penman-Keever or the other officers. Penman-Keever argues that Trooper Jackman must have observed the traffic violation at the time of the stop, otherwise it is an impermissible ex post facto justification.

The dashcam footage, however, shows the Dodge Ram driven by Penman-Keever veer to the right side of the lane, with its tires on the white line. The truck also swerves slightly before again crossing onto the white line. While it is not clear from the video that Penman-Keever actually crossed the white line, Trooper Jackman testified that when the truck's tires were on the white line, its side mirror would have been over the line, which is a violation.

"Importantly, when evaluating an officer's testimony regarding traffic infractions, '[t]he question . . . is whether [the officer] reasonably believed that he saw a traffic violation, not whether [the defendant] actually violated the [law]." *Yang*, 39 F.4th at 900-01 (quoting *Cole*, 21 F.4th at 428); *see also United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019) ("If an officer reasonably thinks he sees a driver commit a traffic infraction, that is a sufficient basis to pull him over without violating the Constitution."); *Whren v. United States*, 517 U.S. 806 (1996) (holding that the temporary detention of a motorist upon reasonable suspicion to believe he has committed a traffic violation does not violate the Fourth Amendment, despite the officer's true motivation for the stop).

Upon reviewing the dashcam video, the Court finds credible Trooper Jackman's testimony that he observed Penman-Keever's vehicle veer to the right and cross onto the white line before he pulled him over. Because Trooper Jackman reasonably believed he witnessed Penman-Keever commit one or more traffic violations, he had reasonable suspicion to initiate the traffic stop.

### B.    Whether the Stop Was Unlawfully Prolonged

Penman-Keever next argues that even if the stop was permissible under *Terry*, it became illegal when Trooper Jackman unlawfully extended it beyond the time necessary to issue a written warning. Trooper Jackman had his license plate number, driver's license, and proof of valid insurance. Because Penman-Keever had no outstanding warrants and no prior convictions, he argues, Trooper Jackman could have quickly completed a background inquiry. Instead, Trooper Jackman waited about 10 minutes to ask Penman-Keever where he was headed and for how long, as well as about his job in Colorado. Then, upon the arrival of Sergeant Patterson, Trooper Jackman mentioned for the first time that he smelled marijuana and asked again about Penman-Keever's travel plans. Finally, 14 minutes into the stop, Jackman told Penman-Keever he was going to conduct a probable cause search.

"Traffic stops must remain limited in scope: A seizure for a traffic violation justifies a police investigation of that violation." *Cole*, 21 F.4th at 427-28 (citation omitted). Tasks within that mission include "determining whether to issue a traffic ticket" and "pursuing ordinary inquiries incident to the traffic stop" such as checking the driver's license, checking for outstanding warrants, and inspecting the car's registration and proof

of insurance. *Id.* at 428. "Such inquiries fall within the mission of a stop because they serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* at 428-29 (quotation omitted).

However, "[a] seizure that is 'lawful at its inception' can violate the Fourth Amendment if it is 'prolonged beyond the time reasonably required to complete' the initial mission of the stop." *Id.* at 438 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)); *Rodriguez*, 575 U.S. at 354-55. Police cannot "detour" from the mission of the traffic stop to investigate other criminal activity unless the officer "has reasonable suspicion of other criminal activity to independently justify prolonging the stop." *Id.* at 428. Even if a driver is told they are "free to go," an officer can extend or prolong the initial stop if information obtained during the stop gives him reasonable suspicion of criminal conduct. *United States v. Walton*, 827 F.3d 682, 687 (7th Cir. 2016).

In *Walton*, the Seventh Circuit found that a court must examine "totality of the circumstances" as they existed prior to the time the officer finished issuing the warning to determine whether the officer had reasonable suspicion of criminal conduct. *Id.* (citing *United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016); *see also United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011) ("When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect.)." Circumstances found by courts to constitute reasonable suspicion of criminal conduct include out-of-state licenses, rental cars registered in different states, inconsistent stories, implausible travel plans, criminal histories involving

drugs, and/or extreme nervousness. *See e.g.*, *Cole*, 21 F.4th at 433-34 (reasonable suspicion of criminal activity existed when driver was extremely nervous, had recently registered and insured vehicle, was in Illinois with a Arizona driver's license and California registration, his job as traveling chef who constantly drove across the country was implausible, and his story about his current travel plan was inconsistent and improbable); *United States v. Ambriz-Villa*, 482 F. Supp. 3d 777, 783 (S.D. Ill. 2020), *aff'd*, 28 F.4th 786 (7th Cir. 2022) (out-of-state license plate, large vehicle, and driver's extreme nervousness, erratic eye movements, and evasive answers to travel questions gave officer reasonable suspicion of criminal conduct); *United States v. Lewis*, 920 F.3d 483, 493 (7th Cir. 2019) (extreme nervousness, inconsistent travel explanations, and fact that driver was on supervised release for a drug offense were factors giving rise to reasonable suspicion).

In this case, Penman-Keever argues that the prolonged stop was not justified by reasonable suspicion of criminal activity when his license and insurance were valid, he had no outstanding warrants or criminal history, and his answers to the travel and employment questions were reasonable. Although Trooper Jackman wrote in his report that he found it odd to attend a graduation party in January, many people graduate in December. Moreover, Jackman never asked questions about the minor passenger while questioning Penman-Keever, and videos of the stop contradict Trooper Jackman's claims that Penman-Keever was "very, very nervous." Instead, Penman-Keever asserts that he openly answered the questions in a friendly, conversational manner.

Again, the Court disagrees. The totality of the circumstances and the information available to Trooper Jackman gave him reasonable suspicion of other criminal activity

that justified prolonging the stop. Trooper Jackman testified that, when asked for proof of insurance, Penman-Keever reached for both the glove box and center console, but quickly stopped himself, potentially hiding a weapon or contraband.[2] Trooper Jackman also reported that Keever's hands were shaking uncontrollably as he made darting dances down the road. Once Penman-Keever was in the police vehicle, he kept one foot out the door with his hand on the door frame. Penman-Keever offered to get Trooper Jackman a water from his rental truck, at which point Penman-Keever could have fled, obtained a weapon, or at least instructed his passenger to hide contraband. Penman-Keever also gave improbable travel plans, which included driving from Colorado to Pennsylvania to attend a graduation party on February 1, 2024 (a Thursday), only to turn right back around and head back to Colorado. These facts, along with the smell of marijuana, gave Trooper Jackson reasonable suspicion that Penman-Keever was engaged in other criminal activity such that the extended stop was justified.

    **C.**    **Probable Cause to Search the Vehicle**

Finally, Penman-Keever asserts there was no probable cause for officers to search his truck because the smell of marijuana, alone, is no longer sufficient to establish probable cause to search a vehicle.

"Warrantless searches are *per se* unreasonable under the Fourth Amendment, subject to only certain exceptions." *United States v. Jackson*, 103 F.4th 483, 486 (7th Cir. 2024). Under the automobile exception to the Fourth Amendment's warrant requirement, officers may search a car without a warrant if they have probable cause. *Id.* "Probable

---

[2] Indeed, Penman-Keever's pistol was located in the center console.

cause to search a vehicle exists when, based on the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *United States v. Sands*, 815 F.3d 1057, 1063 (7th Cir. 2015)).

Until September 2024, the smell of burnt cannabis, alone, was sufficient to establish probable cause to search a vehicle in Illinois. Although use of recreational cannabis, or marijuana, became legal in Illinois on January 1, 2020, Illinois lower courts disagreed as to "the effect of legalization on probable cause for automobile searches." *People v. Redmond*, 248 N.E.3d 1026, 1036 (Ill. 2024). In *Redmond*, the Illinois Supreme Court resolved that issue, holding that "[t]he laws on cannabis have changed in such a drastic way as to render the smell of *burnt* cannabis, standing alone, insufficient to provide probable cause for a police officer to search a vehicle without a warrant." *Redmond*, 248 N.E.3d at 1036–37 (emphasis added). While the smell of burnt marijuana can provide reasonable suspicion warranting further investigation, if that investigation produces no inculpatory facts, then there is no probable cause. *Id.*

In December 2024, the Illinois Supreme Court held the opposite with regard to *raw* cannabis. *People v. Molina*, 2024 WL 4982908, *8 (Ill. Dec. 5, 2024). In *Molina*, the Illinois Supreme Court noted while Illinois has legalized marijuana for recreational use in some circumstances, it still has laws restricting the packaging and use of marijuana. For example, the Illinois Vehicle Code prohibits the possession of cannabis in a motor vehicle unless it is stored in a "sealed, odor-proof, child-resistant cannabis container." *Id.* at *7 (quoting 625 ILCS 5/11-502.15(b), (c)). It then reasoned that "when the odor of raw cannabis comes from a vehicle driven on an Illinois highway, it is almost certain that the

cannabis is being possessed in violation of the Vehicle Code's odor-proof container requirement. *Id.* at *8. Thus, the court held, "the odor of raw cannabis coming from a vehicle being operated on an Illinois highway, alone, is sufficient to provide police officers, who are trained and experienced in distinguishing between burnt and raw cannabis, with probable cause to perform a warrantless search of a vehicle." *Id.* at *9.

While the Seventh Circuit has not yet addressed *Redmond* or *Molina*, it has generally held that the smell of marijuana alone justifies a Fourth Amendment search or seizure. *United States v. Jackson*, 103 F.4th 483, 488 (7th Cir. 2024);[3] *see also Harris v. Melchor*, No. 24-2468, 2025 WL 972467, at *4 (7th Cir. Apr. 1, 2025) (officer in November 2021 traffic stop had probable cause to search vehicle when he smelled marijuana, "even if that belief turned out to be mistaken").

Here, at the time of the stop, Trooper Jackman told Penman-Keever he had probable cause to search the Dodge Ram based on the "strong odor of cannabis" coming from the vehicle. Trooper Jackman did not specify whether he smelled raw cannabis or burnt cannabis. At the evidentiary hearing, Trooper Jackman testified that he immediately smelled raw cannabis upon approaching the vehicle. The Court does not find this testimony credible. Only a small bag of raw marijuana was found, located inside the pocket of a larger backpack. Trooper Jackman acknowledged this in the bodycam footage of his search when he tells Sergeant Heard that Penman-Keever had "a little bit of personal use weed" in the truck. (Doc. 65-3). Trooper Jackman later testified that he

---

[3] The defendant in *Jackson* has filed a Petition for Writ of Certiorari with the U.S. Supreme Court. *United States v. Jackson*, 103 F.4th 483, 485 (7th Cir. 2024), *reh'g denied*, No. 23-1708, 2024 WL 3737320 (7th Cir. Aug. 7, 2024), *petition for cert. filed* (U.S. Nov. 4, 2024) (No. 24-7160).

also smelled burnt marijuana, which the Court finds credible given that Penman-Keever admitted that the minor passenger had smoked marijuana.

But regardless of whether the marijuana that Trooper Jackman smelled was burnt or raw, the search occurred in January 2024, nearly nine months before the Illinois Supreme Court issued its opinion in *Redmond* and 11 months before it issued *Molina*. Because the Illinois Supreme Court had not yet resolved the issue, the Court finds that Trooper Jackman had probable cause to search the truck when he smelled marijuana emitting from it.

Moreover, even if the smell of burnt marijuana only provided reasonable suspicion warranting further investigation, the totality of the information known to Trooper Jackman established probable cause to search the vehicle. Penman-Keever was extremely nervous, he admitted he had a weapon, he appeared to be a flight risk, he was traveling across the country in a rented truck with a 16-year-old girl who was not related to him, and his travel plans were implausible. Because probable cause existed to search the truck, the Court will not suppress any evidence obtained as a result of the search.

## CONCLUSION

For these reasons, the Motion to Suppress Evidence and Statements filed by Defendant Travis J. Penman-Keever (Doc. 58) is **DENIED.**

**IT IS SO ORDERED.**

DATED: May 15, 2025

*[signature]*

NANCY J. ROSENSTENGEL
Chief U.S. District Judge